## KENT *v.* UNITED STATES.

No. 104.   Argued January 19, 1966.—Decided March 21, 1966.

542

*Myron G. Ehrlich* and *Richard Arens* argued the cause for petitioner. With them on the briefs were *Monroe H. Freedman* and *David Carliner.*

*Theodore George Gilinsky* argued the cause for the United States. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Vinson, Nathan Lewin* and *Beatrice Rosenberg.*

*Nicholas N. Kittrie* filed a brief for Thurman Arnold et al., as *amici curiae.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

This case is here on certiorari to the United States Court of Appeals for the District of Columbia Circuit. The facts and the contentions of counsel raise a number

of disturbing questions concerning the administration by the police and the Juvenile Court authorities of the District of Columbia laws relating to juveniles. Apart from raising questions as to the adequacy of custodial and treatment facilities and policies, some of which are not within judicial competence, the case presents important challenges to the procedure of the police and Juvenile Court officials upon apprehension of a juvenile suspected of serious offenses. Because we conclude that the Juvenile Court's order waiving jurisdiction of petitioner was entered without compliance with required procedures, we remand the case to the trial court.

Morris A. Kent, Jr., first came under the authority of the Juvenile Court of the District of Columbia in 1959. He was then aged 14. He was apprehended as a result of several housebreakings and an attempted purse snatching. He was placed on probation, in the custody of his mother who had been separated from her husband since Kent was two years old. Juvenile Court officials interviewed Kent from time to time during the probation period and accumulated a "Social Service" file.

On September 2, 1961, an intruder entered the apartment of a woman in the District of Columbia. He took her wallet. He raped her. The police found in the apartment latent fingerprints. They were developed and processed. They matched the fingerprints of Morris Kent, taken when he was 14 years old and under the jurisdiction of the Juvenile Court. At about 3 p. m. on September 5, 1961, Kent was taken into custody by the police. Kent was then 16 and therefore subject to the "exclusive jurisdiction" of the Juvenile Court. D. C. Code § 11–907 (1961), now § 11–1551 (Supp. IV, 1965). He was still on probation to that court as a result of the 1959 proceedings.

Upon being apprehended, Kent was taken to police headquarters where he was interrogated by police officers.

It appears that he admitted his involvement in the offense which led to his apprehension and volunteered information as to similar offenses involving housebreaking, robbery, and rape. His interrogation proceeded from about 3 p. m. to 10 p. m. the same evening.[1]

Some time after 10 p. m. petitioner was taken to the Receiving Home for Children. The next morning he was released to the police for further interrogation at police headquarters, which lasted until 5 p. m.[2]

The record does not show when his mother became aware that the boy was in custody, but shortly after 2 p. m. on September 6, 1961, the day following petitioner's apprehension, she retained counsel.

Counsel, together with petitioner's mother, promptly conferred with the Social Service Director of the Juvenile Court. In a brief interview, they discussed the possibility that the Juvenile Court might waive jurisdiction under D. C. Code § 11–914 (1961), now § 11–1553 (Supp. IV, 1965) and remit Kent to trial by the District Court. Counsel made known his intention to oppose waiver.

Petitioner was detained at the Receiving Home for almost a week. There was no arraignment during this

---

[1] There is no indication in the file that the police complied with the requirement of the District Code that a child taken into custody, unless released to his parent, guardian or custodian, "shall be placed in the custody of a probation officer or other person designated by the court, or taken immediately to the court or to a place of detention provided by the Board of Public Welfare, and the officer taking him shall immediately notify the court and shall file a petition when directed to do so by the court." D. C. Code § 11–912 (1961), now § 16–2306 (Supp. IV, 1965).

[2] The elicited statements were not used in the subsequent trial before the United States District Court. Since the statements were made while petitioner was subject to the jurisdiction of the Juvenile Court, they were inadmissible in a subsequent criminal prosecution under the rule of *Harling* v. *United States,* 111 U. S. App. D. C. 174, 295 F. 2d 161 (1961).

time, no determination by a judicial officer of probable cause for petitioner's apprehension.[3]

During this period of detention and interrogation, petitioner's counsel arranged for examination of petitioner by two psychiatrists and a psychologist. He thereafter filed with the Juvenile Court a motion for a hearing on the question of waiver of Juvenile Court jurisdiction, together with an affidavit of a psychiatrist certifying that petitioner "is a victim of severe psychopathology" and recommending hospitalization for psychiatric observation. Petitioner's counsel, in support of his motion to the effect that the Juvenile Court should retain jurisdiction of petitioner, offered to prove that if petitioner were given adequate treatment in a hospital under the aegis of the Juvenile Court, he would be a suitable subject for rehabilitation.

---

[3] In the case of adults, arraignment before a magistrate for determination of probable cause and advice to the arrested person as to his rights, etc., are provided by law and are regarded as fundamental. Cf. Fed. Rules Crim. Proc. 5 (a), (b); *Mallory* v. *United States,* 354 U. S. 449. In *Harling* v. *United States, supra,* the Court of Appeals for the District of Columbia has stated the basis for this distinction between juveniles and adults as follows:

"It is, of course, because children are, generally speaking, exempt from criminal penalties that safeguards of the criminal law, such as Rule 5 and the exclusionary Mallory rule, have no general application in juvenile proceedings." 111 U. S. App. D. C., at 176, 295 F. 2d, at 163.

In *Edwards* v. *United States,* 117 U. S. App. D. C. 383, 384, 330 F. 2d 849, 850 (1964), it was said that: ". . . special practices . . . follow the apprehension of a juvenile. He may be held in custody by the juvenile authorities—and is available to investigating officers—for five days before any formal action need be taken. There is no duty to take him before a magistrate, and no responsibility to inform him of his rights. He is not booked. The statutory intent is to establish a non-punitive, non-criminal atmosphere."

We indicate no view as to the legality of these practices. Cf. *Harling* v. *United States, supra,* 111 U. S. App. D. C., at 176, 295 F. 2d, at 163, n. 12.

At the same time, petitioner's counsel moved that the Juvenile Court should give him access to the Social Service file relating to petitioner which had been accumulated by the staff of the Juvenile Court during petitioner's probation period, and which would be available to the Juvenile Court judge in considering the question whether it should retain or waive jurisdiction. Petitioner's counsel represented that access to this file was essential to his providing petitioner with effective assistance of counsel.

The Juvenile Court judge did not rule on these motions. He held no hearing. He did not confer with petitioner or petitioner's parents or petitioner's counsel. He entered an order reciting that after "full investigation, I do hereby waive" jurisdiction of petitioner and directing that he be "held for trial for [the alleged] offenses under the regular procedure of the U. S. District Court for the District of Columbia." He made no findings. He did not recite any reason for the waiver.[4] He made no reference to the motions filed by petitioner's counsel. We must assume that he denied, *sub silentio*, the motions for a hearing, the recommendation for hospitalization for psychiatric observation, the request for access to the Social Service file, and the offer to prove that petitioner was a fit subject for rehabilitation under the Juvenile Court's jurisdiction.[5]

---

[4] At the time of these events, there was in effect Policy Memorandum No. 7 of November 30, 1959, promulgated by the judge of the Juvenile Court to set forth the criteria to govern disposition of waiver requests. It is set forth in the Appendix. This Memorandum has since been rescinded. See *United States* v. *Caviness*, 239 F. Supp. 545, 550 (D. C. D. C. 1965).

[5] It should be noted that at this time the statute provided for only one Juvenile Court judge. Congressional hearings and reports attest the impossibility of the burden which he was supposed to carry. See Amending the Juvenile Court Act of the District of Columbia, Hearings before Subcommittee No. 3 of the House Com-

Presumably, prior to entry of his order, the Juvenile Court judge received and considered recommendations of the Juvenile Court staff, the Social Service file relating to petitioner, and a report dated September 8, 1961 (three days following petitioner's apprehension), submitted to him by the Juvenile Probation Section. The Social Service file and the September 8 report were later sent to the District Court and it appears that both of them referred to petitioner's mental condition. The September 8 report spoke of "a rapid deterioration of [petitioner's] personality structure and the possibility of mental illness." As stated, neither this report nor the Social Service file was made available to petitioner's counsel.

The provision of the Juvenile Court Act governing waiver expressly provides only for "full investigation." It states the circumstances in which jurisdiction may be waived and the child held for trial under adult procedures, but it does not state standards to govern the Juvenile Court's decision as to waiver. The provision reads as follows:

> "If a child sixteen years of age or older is charged with an offense which would amount to a felony in the case of an adult, or any child charged with an offense which if committed by an adult is punishable by death or life imprisonment, the judge may, after full investigation, waive jurisdiction and order

mittee on the District of Columbia, 87th Cong., 1st Sess. (1961); Juvenile Delinquency, Hearings before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, 86th Cong., 1st Sess. (1959–1960); Additional Judges for Juvenile Court, Hearing before the House Committee on the District of Columbia, 86th Cong., 1st Sess. (1959); H. R. Rep. No. 1041, 87th Cong., 1st Sess. (1961); S. Rep. No. 841, 87th Cong., 1st Sess. (1961); S. Rep. No. 116, 86th Cong., 1st Sess. (1959). The statute was amended in 1962 to provide for three judges for the court. 76 Stat. 21; D. C. Code § 11–1502 (Supp. IV, 1965).

such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult; or such other court may exercise the powers conferred upon the juvenile court in this subchapter in conducting and disposing of such cases." [6]

Petitioner appealed from the Juvenile Court's waiver order to the Municipal Court of Appeals, which affirmed, and also applied to the United States District Court for a writ of habeas corpus, which was denied. On appeal from these judgments, the United States Court of Appeals held on January 22, 1963, that neither appeal to the Municipal Court of Appeals nor habeas corpus was available. In the Court of Appeals' view, the exclusive method of reviewing the Juvenile Court's waiver order was a motion to dismiss the indictment in the District Court. *Kent* v. *Reid,* 114 U. S. App. D. C. 330, 316 F. 2d 331 (1963).

Meanwhile, on September 25, 1961, shortly after the Juvenile Court order waiving its jurisdiction, petitioner was indicted by a grand jury of the United States District Court for the District of Columbia. The indictment contained eight counts alleging two instances of housebreaking, robbery, and rape, and one of housebreaking and robbery. On November 16, 1961, petitioner moved the District Court to dismiss the indictment on the grounds that the waiver was invalid. He also moved the District Court to constitute itself a Juvenile Court as authorized by D. C. Code § 11–914 (1961), now § 11–1553 (Supp. IV, 1965). After substantial delay occasioned by petitioner's appeal and habeas corpus proceedings, the District Court addressed itself to the motion to dismiss on February 8, 1963.[7]

---

[6] D. C. Code § 11–914 (1961), now § 11–1553 (Supp. IV, 1965).

[7] On February 5, 1963, the motion to the District Court to constitute itself a Juvenile Court was denied. The motion was renewed

The District Court denied the motion to dismiss the indictment. The District Court ruled that it would not "go behind" the Juvenile Court judge's recital that his order was entered "after full investigation." It held that "The only matter before me is as to whether or not the statutory provisions were complied with and the Courts have held . . . with reference to full investigation, that that does not mean a quasi judicial or judicial hearing. No hearing is required."

On March 7, 1963, the District Court held a hearing on petitioner's motion to determine his competency to stand trial. The court determined that petitioner was competent.[8]

---

orally and denied on February 8, 1963, after the District Court's decision that the indictment should not be dismissed.

[8] The District Court had before it extensive information as to petitioner's mental condition, bearing upon both competence to stand trial and the defense of insanity. The court had obtained the "Social Service" file from the Juvenile Court and had made it available to petitioner's counsel. On October 13, 1961, the District Court had granted petitioner's motion of October 6 for commitment to the Psychiatric Division of the General Hospital for 60 days. On December 20, 1961, the hospital reported that "It is the concensus [sic] of the staff that Morris is emotionally ill and severely so . . . we feel that he is incompetent to stand trial and to participate in a mature way in his own defense. His illness has interfered with his judgment and reasoning ability . . . ." The prosecutor opposed a finding of incompetence to stand trial, and at the prosecutor's request, the District Court referred petitioner to St. Elizabeths Hospital for psychiatric observation. According to a letter from the Superintendent of St. Elizabeths of April 5, 1962, the hospital's staff found that petitioner was "suffering from mental disease at the present time, Schizophrenic Reaction, Chronic Undifferentiated Type," that he had been suffering from this disease at the time of the charged offenses, and that "if committed by him [those criminal acts] were the product of this disease." They stated, however, that petitioner was "mentally competent to understand the nature of the proceedings against him and to consult properly with counsel in his own defense."

At trial, petitioner's defense was wholly directed toward proving that he was not criminally responsible because "his unlawful act was the product of mental disease or mental defect." *Durham* v. *United States,* 94 U. S. App. D. C. 228, 241, 214 F. 2d 862, 875 (1954). Extensive evidence, including expert testimony, was presented to support this defense. The jury found as to the counts alleging rape that petitioner was "not guilty by reason of insanity." Under District of Columbia law, this made it mandatory that petitioner be transferred to St. Elizabeths Hospital, a mental institution, until his sanity is restored.[9] On the six counts of housebreaking and robbery, the jury found that petitioner was guilty.[10]

Kent was sentenced to serve five to 15 years on each count as to which he was found guilty, or a total of 30 to 90 years in prison. The District Court ordered that the time to be spent at St. Elizabeths on the mandatory commitment after the insanity acquittal be counted as part of the 30- to 90-year sentence. Petitioner appealed to the United States Court of Appeals for the District of Columbia Circuit. That court affirmed. 119 U. S. App. D. C. 378, 343 F. 2d 247 (1964).[11]

---

[9] D. C. Code § 24–301 (1961).

[10] The basis for this distinction—that petitioner was "sane" for purposes of the housebreaking and robbery but "insane" for the purposes of the rape—apparently was the hypothesis, for which there is some support in the record, that the jury might find that the robberies had anteceded the rapes, and in that event, it might conclude that the housebreakings and robberies were not the products of his mental disease or defect, while the rapes were produced thereby.

[11] Petitioner filed a petition for rehearing *en banc,* but subsequently moved to withdraw the petition in order to prosecute his petition for certiorari to this Court. The Court of Appeals permitted withdrawal. Chief Judge Bazelon filed a dissenting opinion in which Circuit Judge Wright joined. 119 U. S. App. D. C., at 395, 343 F. 2d, at 264 (1964).

Before the Court of Appeals and in this Court, petitioner's counsel has urged a number of grounds for reversal. He argues that petitioner's detention and interrogation, described above, were unlawful. He contends that the police failed to follow the procedure prescribed by the Juvenile Court Act in that they failed to notify the parents of the child and the Juvenile Court itself, note 1, *supra;* that petitioner was deprived of his liberty for about a week without a determination of probable cause which would have been required in the case of an adult, see note 3, *supra;* that he was interrogated by the police in the absence of counsel or a parent, cf. *Harling* v. *United States,* 111 U. S. App. D. C. 174, 176, 295 F. 2d 161, 163, n. 12 (1961), without warning of his right to remain silent or advice as to his right to counsel, in asserted violation of the Juvenile Court Act and in violation of rights that he would have if he were an adult; and that petitioner was fingerprinted in violation of the asserted intent of the Juvenile Court Act and while unlawfully detained and that the fingerprints were unlawfully used in the District Court proceeding.[12]

These contentions raise problems of substantial concern as to the construction of and compliance with the Juvenile Court Act. They also suggest basic issues as to the justifiability of affording a juvenile less protection than is accorded to adults suspected of criminal offenses, particularly where, as here, there is an absence of any indication that the denial of rights available to adults was offset, mitigated or explained by action of the Government, as *parens patriae,* evidencing the special

[12] Cf. *Harling* v. *United States,* 111 U. S. App. D. C. 174, 295 F. 2d 161 (1961); *Bynum* v. *United States,* 104 U. S. App. D. C. 368, 262 F. 2d 465 (1958). It is not clear from the record whether the fingerprints used were taken during the detention period or were those taken while petitioner was in custody in 1959, nor is it clear that petitioner's counsel objected to the use of the fingerprints.

solicitude for juveniles commanded by the Juvenile Court Act. However, because we remand the case on account of the procedural error with respect to waiver of jurisdiction, we do not pass upon these questions.[13]

It is to petitioner's arguments as to the infirmity of the proceedings by which the Juvenile Court waived its otherwise exclusive jurisdiction that we address our attention. Petitioner attacks the waiver of jurisdiction on a number of statutory and constitutional grounds. He contends that the waiver is defective because no hearing was held; because no findings were made by the Juvenile Court; because the Juvenile Court stated no reasons for waiver; and because counsel was denied access to the Social Service file which presumably was considered by the Juvenile Court in determining to waive jurisdiction.

We agree that the order of the Juvenile Court waiving its jurisdiction and transferring petitioner for trial in the United States District Court for the District of Columbia was invalid. There is no question that the order is reviewable on motion to dismiss the indictment in the District Court, as specified by the Court of Appeals in this case. *Kent* v. *Reid, supra.* The issue is the standards to be applied upon such review.

We agree with the Court of Appeals that the statute contemplates that the Juvenile Court should have con-

---

[13] Petitioner also urges that the District Court erred in the following respects:

(1) It gave the jury a version of the "Allen" charge. See *Allen* v. *United States*, 164 U. S. 492.

(2) It failed to give an adequate and fair competency hearing.

(3) It denied the motion to constitute itself a juvenile court pursuant to D. C. Code § 11–914 (1961), now § 11–1553. (Supp. IV, 1965.)

(4) It should have granted petitioner's motion for acquittal on all counts, *n. o. v.*, on the grounds of insanity.

We decide none of these claims.

siderable latitude within which to determine whether it should retain jurisdiction over a child or—subject to the statutory delimitation [14]—should waive jurisdiction. But this latitude is not complete. At the outset, it assumes procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement of a "full investigation." *Green* v. *United States*, 113 U. S. App. D. C. 348, 308 F. 2d 303 (1962).[15] The statute gives the Juvenile Court a substantial degree of discretion as to the factual considerations to be evaluated, the weight to be given them and the conclusion to be reached. It does not confer upon the Juvenile Court a license for arbitrary procedure. The statute does not permit the Juvenile Court to determine in isolation and without the participation or any representation of the child the "critically important" question whether a child will be deprived of the special protections and provisions of the Juvenile Court Act.[16] It does not authorize the Juvenile Court, in total disregard of a motion for hearing filed by counsel, and without any hearing or statement or reasons, to decide—as in this case—that the child will be taken from the Receiving Home for Children

---

[14] The statute is set out at pp. 547–548, *supra*.

[15] "What is required before a waiver is, as we have said, 'full investigation.' . . . It prevents the waiver of jurisdiction as a matter of routine for the purpose of easing the docket. It prevents routine waiver in certain classes of alleged crimes. It requires a judgment in each case based on 'an inquiry not only into the facts of the alleged offense but also into the question whether the *parens patriae* plan of procedure is desirable and proper in the particular case.' *Pee* v. *United States*, 107 U. S. App. D. C. 47, 50; 274 F. 2d 556, 559 (1959)." *Green* v. *United States, supra,* at 350, 308 F. 2d, at 305.

[16] See *Watkins* v. *United States,* 119 U. S. App. D. C. 409, 413, 343 F. 2d 278, 282 (1964); *Black* v. *United States,* 122 U. S. App. D. C. 393, 355 F. 2d 104 (1965).

and transferred to jail along with adults, and that he will be exposed to the possibility of a death sentence [17] instead of treatment for a maximum, in Kent's case, of five years, until he is 21.[18]

We do not consider whether, on the merits, Kent should have been transferred; but there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons. It is inconceivable that a court of justice dealing with adults, with respect to a similar issue, would proceed in this manner. It would be extraordinary if society's special concern for children, as reflected in the District of Columbia's Juvenile Court Act, permitted this procedure. We hold that it does not.

1. The theory of the District's Juvenile Court Act, like that of other jurisdictions,[19] is rooted in social welfare philosophy rather than in the *corpus juris*. Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is *parens*

---

[17] D. C. Code § 22–2801 (1961) fixes the punishment for rape at 30 years, or death if the jury so provides in its verdict. The maximum punishment for housebreaking is 15 years, D. C. Code § 22–1801 (1961); for robbery it is also 15 years, D. C. Code § 22–2901 (1961).

[18] The jurisdiction of the Juvenile Court over a child ceases when he becomes 21. D. C. Code § 11–907 (1961), now § 11–1551 (Supp. IV, 1965).

[19] All States have juvenile court systems. A study of the actual operation of these systems is contained in Note, Juvenile Delinquents: The Police, State Courts, and Individualized Justice, 79 Harv. L. Rev. 775 (1966).

*patriae* rather than prosecuting attorney and judge.[20] But the admonition to function in a "parental" relationship is not an invitation to procedural arbitrariness.

2. Because the State is supposed to proceed in respect of the child as *parens patriae* and not as adversary, courts have relied on the premise that the proceedings are "civil" in nature and not criminal, and have asserted that the child cannot complain of the deprivation of important rights available in criminal cases. It has been asserted that he can claim only the fundamental due process right to fair treatment.[21] For example, it has been held that he is not entitled to bail; to indictment by grand jury; to a speedy and public trial; to trial by jury; to immunity against self-incrimination; to confrontation of his accusers; and in some jurisdictions (but not in the District of Columbia, see *Shioutakon* v. *District of Columbia,* 98 U. S. App. D. C. 371, 236 F. 2d 666 (1956), and *Black* v. *United States, supra*) that he is not entitled to counsel.[22]

While there can be no doubt of the original laudable purpose of juvenile courts, studies and critiques in recent years raise serious questions as to whether actual performance measures well enough against theoretical purpose to make tolerable the immunity of the process from the reach of constitutional guaranties applicable to adults.[23] There is much evidence that some juvenile courts, including that of the District of Columbia, lack

---

[20] See Handler, The Juvenile Court and the Adversary System: Problems of Function and Form, 1965 Wis. L. Rev. 7.

[21] *Pee* v. *United States,* 107 U. S. App. D. C. 47, 274 F. 2d 556 (1959).

[22] See *Pee* v. *United States, supra,* at 54, 274 F. 2d, at 563; Paulsen, Fairness to the Juvenile Offender, 41 Minn. L. Rev. 547 (1957).

[23] Cf. *Harling* v. *United States,* 111 U. S. App. D. C. 174, 177, 295 F. 2d 161, 164 (1961).

the personnel, facilities and techniques to perform adequately as representatives of the State in a *parens patriae* capacity, at least with respect to children charged with law violation. There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children.[24]

This concern, however, does not induce us in this case to accept the invitation [25] to rule that constitutional guaranties which would be applicable to adults charged with the serious offenses for which Kent was tried must be applied in juvenile court proceedings concerned with allegations of law violation. The Juvenile Court Act and the decisions of the United States Court of Appeals for the District of Columbia Circuit provide an adequate basis for decision of this case, and we go no further.

3. It is clear beyond dispute that the waiver of jurisdiction is a "critically important" action determining vitally important statutory rights of the juvenile. The Court of Appeals for the District of Columbia Circuit has so held. See *Black v. United States, supra; Watkins* v. *United States,* 119 U. S. App. D. C. 409, 343 F. 2d 278 (1964). The statutory scheme makes this plain. The Juvenile Court is vested with "original and exclusive jurisdiction" of the child. This jurisdiction confers special rights and immunities. He is, as specified by the statute, shielded from publicity. He may be confined, but with rare exceptions he may not be jailed along with adults. He may be detained, but only until he is 21 years of age. The court is admonished by the statute to give preference to retaining the child in the custody of his parents "unless his welfare and the safety and protec-

---

[24] See Handler, *op. cit. supra,* note 20; Note, *supra,* note 19; materials cited in note 5, *supra.*

[25] See brief of *amicus curiae.*

tion of the public can not be adequately safeguarded without . . . removal." The child is protected against consequences of adult conviction such as the loss of civil rights, the use of adjudication against him in subsequent proceedings, and disqualification for public employment. D. C. Code §§ 11–907, 11–915, 11–927, 11–929 (1961).[26]

The net, therefore, is that petitioner—then a boy of 16—was by statute entitled to certain procedures and benefits as a consequence of his statutory right to the "exclusive" jurisdiction of the Juvenile Court. In these circumstances, considering particularly that decision as to waiver of jurisdiction and transfer of the matter to the District Court was potentially as important to petitioner as the difference between five years' confinement and a death sentence, we conclude that, as a condition to a valid waiver order, petitioner was entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court's decision. We believe that this result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel.[27]

The Court of Appeals in this case relied upon *Wilhite* v. *United States,* 108 U. S. App. D. C. 279, 281 F. 2d 642 (1960). In that case, the Court of Appeals held, for purposes of a determination as to waiver of jurisdiction,

---

[26] These are now, without substantial changes, §§ 11–1551, 16–2307, 16–2308, 16–2313, 11–1586 (Supp. IV, 1965).

[27] While we "will not ordinarily review decisions of the United States Court of Appeals [for the District of Columbia Circuit] which are based upon statutes . . . limited [to the District] . . . ," *Del Vecchio* v. *Bowers,* 296 U. S. 280, 285, the position of that court, as we discuss *infra,* is self-contradictory. Nor have we deferred to decisions on local law where to do so would require adjudication of difficult constitutional questions. See *District of Columbia* v. *Little,* 339 U. S. 1.

that no formal hearing is required and that the "full investigation" required of the Juvenile Court need only be such "as is needed to satisfy *that* court . . . on the question of waiver."[28] (Emphasis supplied.) The authority of *Wilhite,* however, is substantially undermined by other, more recent, decisions of the Court of Appeals.

In *Black* v. *United States,* decided by the Court of Appeals on December 8, 1965, the court[29] held that assistance of counsel in the "critically important" determination of· waiver is essential to the proper administration of juvenile proceedings. Because the juvenile was not advised of his right to retained or appointed counsel, the judgment of the District Court, following waiver of jurisdiction by the Juvenile Court, was reversed. The court relied upon its decision in *Shioutakon* v. *District of Columbia,* 98 U. S. App. D. C. 371, 236 F. 2d 666 (1956), in which it had held that effective assistance of counsel in juvenile court proceedings is essential. See also *McDaniel* ·v. *Shea,* 108 U. S. App. D. C. 15, 278 F. 2d 460 (1960). In *Black,* the court referred to the Criminal Justice Act, enacted four years after *Shioutakon,* in which Congress provided for the assistance of counsel "in proceedings before the juvenile court of the District of Columbia." D. C. Code § 2–2202 (1961). The court held that "The need is even greater in the adjudication of waiver [than in a case like *Shioutakon*] since it contemplates the imposition of criminal sanctions." 122 U. S. App. D. C., at 395, 355 F. 2d, at 106.

In *Watkins* v. *United States,* 119 U. S. App. D. C. 409, 343 F. 2d 278 (1964), decided in November 1964, the

---

[28] The panel was composed of Circuit Judges Miller, Fahy and Burger. Judge Fahy concurred in the result. It appears that the attack on the regularity of the waiver of jurisdiction was made 17 years after the event, and that no objection to waiver had been made in the District Court.

[29] Bazelon, C. J., and Fahy and Leventhal, JJ.

Juvenile Court had waived jurisdiction of appellant who was charged with housebreaking and larceny. In the District Court, appellant sought disclosure of the social record in order to attack the validity of the waiver. The Court of Appeals held that in a waiver proceeding a juvenile's attorney is entitled to access to such records. The court observed that

> "All of the social records concerning the child are usually relevant to waiver since the Juvenile Court must be deemed to consider the entire history of the child in determining waiver. The relevance of particular items must be construed generously. Since an attorney has no certain knowledge of what the social records contain, he cannot be expected to demonstrate the relevance of particular items in his request.
>
> "The child's attorney must be advised of the information upon which the Juvenile Court relied in order to assist effectively in the determination of the waiver question, by insisting upon the statutory command that waiver can be ordered only after 'full investigation,' and by guarding against action of the Juvenile Court beyond its discretionary authority." 119 U. S. App. D. C., at 413, 343 F. 2d, at 282.

The court remanded the record to the District Court for a determination of the extent to which the records should be disclosed.

The Court of Appeals' decision in the present case was handed down on October 26, 1964, prior to its decisions in *Black* and *Watkins*. The Court of Appeals assumed that since petitioner had been a probationer of the Juvenile Court for two years, that court had before it sufficient evidence to make an informed judgment. It therefore concluded that the statutory requirement of a "full investigation" had been met. It noted the absence of

"a specification by the Juvenile Court Judge of precisely why he concluded to waive jurisdiction." 119 U. S. App. D. C., at 384, 343 F. 2d, at 253. While it indicated that "in some cases at least" a useful purpose might be served "by a discussion of the reasons motivating the determination," *id.*, at 384, 343 F. 2d, at 253, n. 6, it did not conclude that the absence thereof invalidated the waiver.

As to the denial of access to the social records, the Court of Appeals stated that "the statute is ambiguous." It said that petitioner's claim, in essence, is "that counsel should have the opportunity to challenge them, presumably in a manner akin to cross-examination." *Id.*, at 389, 343 F. 2d, at 258. It held, however, that this is "the kind of adversarial tactics which the system is designed to avoid." It characterized counsel's proper function as being merely that of bringing forward affirmative information which might help the court. His function, the Court of Appeals said, "is not to denigrate the staff's submissions and recommendations." *Ibid.* Accordingly, it held that the Juvenile Court had not abused its discretion in denying access to the social records.

We are of the opinion that the Court of Appeals misconceived the basic issue and the underlying values in this case. It did note, as another panel of the same court did a few months later in *Black* and *Watkins,* that the determination of whether to transfer a child from the statutory structure of the Juvenile Court to the criminal processes of the District Court is "critically important." We hold that it is, indeed, a "critically important" proceeding. The Juvenile Court Act confers upon the child a right to avail himself of that court's "exclusive" jurisdiction. As the Court of Appeals has said, "[I]t is implicit in [the Juvenile Court] scheme that non-criminal treatment is to be the rule—and the adult criminal treatment, the exception which must be gov-

erned by the particular factors of individual cases." *Harling* v. *United States,* 111 U. S. App. D. C. 174, 177–178, 295 F. 2d 161, 164–165 (1961).

Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions. It must have before it a statement of the reasons motivating the waiver including, of course, a statement of the relevant facts. It may not "assume" that there are adequate reasons, nor may it merely assume that "full investigation" has been made. Accordingly, we hold that it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor. We do not read the statute as requiring that this statement must be formal or that it should necessarily include conventional findings of fact. But the statement should be sufficient to demonstrate that the statutory requirement of "full investigation" has been met; and that the question has received the careful consideration of the Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review.

Correspondingly, we conclude that an opportunity for a hearing which may be informal, must be given the child prior to entry of a waiver order. Under *Black,* the child is entitled to counsel in connection with a waiver proceeding, and under *Watkins,* counsel is entitled to see the child's social records. These rights are meaningless—an illusion, a mockery—unless counsel is given an opportunity to function.

The right to representation by counsel is not a formality. It is not a grudging gesture to a ritualistic requirement. It is of the essence of justice. Appointment of counsel without affording an opportunity for hearing on a "critically important" decision is tantamount to denial of counsel. There is no justification

for the failure of the Juvenile Court to rule on the motion for hearing filed by petitioner's counsel, and it was error to fail to grant a hearing.

We do not mean by this to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment. *Pee* v. *United States,* 107 U. S. App. D. C. 47, 50, 274 F. 2d 556, 559 (1959).

With respect to access by the child's counsel to the social records of the child, we deem it obvious that since these are to be considered by the Juvenile Court in making its decision to waive, they must be made available to the child's counsel. This is what the Court of Appeals itself held in *Watkins.* There is no doubt as to the statutory basis for this conclusion, as the Court of Appeals pointed out in *Watkins.* We cannot agree with the Court of Appeals in the present case that the statute is "ambiguous." The statute expressly provides that the record shall be withheld from "indiscriminate" public inspection, "except that such records or parts thereof *shall* be made available by rule of court or special order of court to such persons . . . as have a *legitimate interest* in the protection . . . of the child . . . ." D. C. Code § 11–929 (b) (1961), now § 11–1586 (b) (Supp. IV, 1965). (Emphasis supplied.)[30] The Court of Appeals has held in *Black,* and we agree, that counsel must be afforded to the child in waiver proceedings. Counsel, therefore,

---

[30] Under the statute, the Juvenile Court has power by rule or order, to subject the examination of the social records to conditions which will prevent misuse of the information. Violation of any such rule or order, or disclosure of the information "except for purposes for which . . . released," is a misdemeanor. D. C. Code § 11–929 (1961), now, without substantial change, § 11–1586 (Supp. IV, 1965).

have a "legitimate interest" in the protection of the child, and must be afforded access to these records.[31]

We do not agree with the Court of Appeals' statement, attempting to justify denial of access to these records, that counsel's role is limited to presenting "to the court anything on behalf of the child which might help the court in arriving at a decision; it is not to denigrate the staff's submissions and recommendations." On the contrary, if the staff's submissions include materials which are susceptible to challenge or impeachment, it is precisely the role of counsel to "denigrate" such matter. There is no irrebuttable presumption of accuracy attached to staff reports. If a decision on waiver is "critically important" it is equally of "critical importance" that the material submitted to the judge—which is protected by the statute only against "indiscriminate" inspection—be subjected, within reasonable limits having regard to the theory of the Juvenile Court Act, to examination, criticism and refutation. While the Juvenile Court judge may, of course, receive *ex parte* analyses and recommendations from his staff, he may not, for purposes of a decision on waiver, receive and rely upon secret information, whether emanating from his staff or otherwise. The Juvenile Court is governed in this respect by the established principles which control courts and quasi-judicial agencies of the Government.

For the reasons stated, we conclude that the Court of Appeals and the District Court erred in sustaining the validity of the waiver by the Juvenile Court. The Government urges that any error committed by the Juvenile

[31] In *Watkins,* the Court of Appeals seems to have permitted withholding of some portions of the social record from examination by petitioner's counsel. To the extent that *Watkins* is inconsistent with the standard which we state, it cannot be considered as controlling.

Court was cured by the proceedings before the District Court. It is true that the District Court considered and denied a motion to dismiss on the grounds of the invalidity of the waiver order of the Juvenile Court, and that it considered and denied a motion that it should itself, as authorized by statute, proceed in this case to "exercise the powers conferred upon the juvenile court." D. C. Code § 11–914 (1961), now § 11–1553 (Supp. IV, 1965). But we agree with the Court of Appeals in *Black,* that "the waiver question was primarily and initially one for the Juvenile Court to decide and its failure to do so in a valid manner cannot be said to be harmless error. It is the Juvenile Court, not the District Court, which has the facilities, personnel and expertise for a proper determination of the waiver issue." 122 U. S. App. D. C., at 396, 355 F. 2d, at 107.[32]

Ordinarily we would reverse the Court of Appeals and direct the District Court to remand the case to the Juvenile Court for a new determination of waiver. If on remand the decision were against waiver, the indictment in the District Court would be dismissed. See *Black* v. *United States, supra.* However, petitioner has now passed the age of 21 and the Juvenile Court can no longer exercise jurisdiction over him. In view of the unavailability of a redetermination of the waiver question by the Juvenile Court, it is urged by petitioner that the conviction should be vacated and the indictment dismissed. In the circumstances of this case, and in light of the remedy which the Court of Appeals fashioned in

---

[32] It also appears that the District Court requested and obtained the Social Service file and the probation staff's report of September 8, 1961, and that these were made available to petitioner's counsel. This did not cure the error of the Juvenile Court. Perhaps the point of it is that it again illustrates the maxim that while nondisclosure may contribute to the comfort of the staff, disclosure does not cause heaven to fall.

*Black, supra,* we do not consider it appropriate to grant this drastic relief.[33] Accordingly, we vacate the order of the Court of Appeals and the judgment of the District Court and remand the case to the District Court for a hearing *de novo* on waiver, consistent with this opinion.[34] If that court finds that waiver was inappropriate, petitioner's conviction must be vacated. If, however, it finds that the waiver order was proper when originally made, the District Court may proceed, after consideration of such motions as counsel may make and such further proceedings, if any, as may be warranted, to enter an appropriate judgment. Cf. *Black* v. *United States, supra.*

*Reversed and remanded.*

## APPENDIX TO OPINION OF THE COURT.

*Policy Memorandum No. 7, November 30, 1959.*

The authority of the Judge of the Juvenile Court of the District of Columbia to waive or transfer jurisdiction to the U. S. District Court for the District of Columbia is contained in the Juvenile Court Act (§ 11–914 D. C. Code, 1951 Ed.). This section permits the Judge to waive jurisdiction "after full investigation" in the case of any child "sixteen years of age or older [who is] charged with an offense which would amount to a felony in the case of an adult, or any child charged with an

---

[33] Petitioner is in St. Elizabeths Hospital for psychiatric treatment as a result of the jury verdict on the rape charges.

[34] We do not deem it appropriate merely to vacate the judgment and remand to the Court of Appeals for reconsideration of its present decision in light of its subsequent decisions in *Watkins* and *Black, supra.* Those cases were decided by different panels of the Court of Appeals from that which decided the present case, and in view of our grant of certiorari and of the importance of the issue, we consider it necessary to resolve the question presented instead of leaving it open for further consideration by the Court of Appeals.

offense which if committed by an adult is punishable by death or life imprisonment."

The statute sets forth no specific standards for the exercise of this important discretionary act, but leaves the formulation of such criteria to the Judge. A knowledge of the Judge's criteria is important to the child, his parents, his attorney, to the judges of the U. S. District Court for the District of Columbia, to the United States Attorney and his assistants, and to the Metropolitan Police Department, as well as to the staff of this court, especially the Juvenile Intake Section.

Therefore, the Judge has consulted with the Chief Judge and other judges of the U. S. District Court for the District of Columbia, with the United States Attorney, with representatives of the Bar, and with other groups concerned and has formulated the following criteria and principles concerning waiver of jurisdiction which are consistent with the basic aims and purpose of the Juvenile Court Act.

An offense falling within the statutory limitations (set forth above) will be waived if it has prosecutive merit and if it is heinous or of an aggravated character, or—even though less serious—if it represents a pattern of repeated offenses which indicate that the juvenile may be beyond rehabilitation under Juvenile Court procedures, or if the public needs the protection afforded by such action.

The determinative factors which will be considered by the Judge in deciding whether the Juvenile Court's jurisdiction over such offenses will be waived are the following:

1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

4. The prosecutive merit of the complaint, i. e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U. S. District Court for the District of Columbia.

6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

It will be the responsibility of any officer of the Court's staff assigned to make the investigation of any complaint in which waiver of jurisdiction is being considered to develop fully all available information which may bear upon the criteria and factors set forth above. Although not all such factors will be involved in an individual case, the Judge will consider the relevant factors in a

specific case before reaching a conclusion to waive juvenile jurisdiction and transfer the case to the U. S. District Court for the District of Columbia for trial under the adult procedures of that Court.

MR. JUSTICE STEWART, with whom MR. JUSTICE BLACK, MR. JUSTICE HARLAN and MR. JUSTICE WHITE join, dissenting.

This case involves the construction of a statute applicable only to the District of Columbia. Our general practice is to leave undisturbed decisions of the Court of Appeals for the District of Columbia Circuit concerning the import of legislation governing the affairs of the District. *General Motors Corp.* v. *District of Columbia*, 380 U. S. 553, 556. It appears, however, that two cases decided by the Court of Appeals subsequent to its decision in the present case may have considerably modified the court's construction of the statute. Therefore, I would vacate this judgment and remand the case to the Court of Appeals for reconsideration in the light of its subsequent decisions, *Watkins* v. *United States*, 119 U. S. App. D. C. 409, 343 F. 2d 278, and *Black* v. *United States*, 122 U. S. App. D. C. 393, 355 F. 2d 104.